## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**NSEM, LLC,** *previously known as*                     **PLAINTIFF**
*New South Equipment Mats, LLC*

**v.**                              **Civil No. 3:17cv798-HSO-LRA**

**STEPHEN E. BUTLER**                           **DEFENDANT**

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION [34] FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion [34] for Summary Judgment filed by Defendant Stephen Butler ("Butler"). Plaintiff NSEM, LLC, formerly known as New South Equipment Mats, LLC ("New South"), claims that when it hired Butler as a salesman, it required him to sign a Confidentiality and Non-Solicitation Agreement. New South Equipment Mats later sold substantially all of its assets to a different company, changed its name to NSEM, and terminated Butler from his employment. After Butler went to work for Sterling Lumber, a competitor of New South, he allegedly began contacting some of his former customers from New South.

In this case, New South asserts that Butler has violated his Confidentiality and Non-Solicitation Agreement and has misappropriated trade secrets. Butler moves for summary judgment, arguing that New South cannot enforce the Agreement against him because New South has terminated its business and because the Agreement is unreasonable. Furthermore, Butler contends that New

South no longer owns any trade secrets. After due consideration of the record, the submissions on file, and relevant legal authority, the Court finds that Butler's Motion [34] should be granted in part as to New South's breach of contract, unjust enrichment, and conversion claims. These claims will be dismissed with prejudice. Butler's Motion will be denied in part without prejudice as to New South's claim for misappropriation of trade secrets.

## I. BACKGROUND

A.    Factual Background

   1.    New South hires Butler and he executes a Confidentiality and Non-Solicitation Agreement.

Most of the relevant facts in this case are not in dispute. In January 2014, New South hired Butler as a sales agent. Def.'s Aff. [34-1] ¶ 3. New South was a company that sold "access mats," which are wooden mats used to create temporary roads for transporting construction equipment. *Id.* ¶ 4. On January 23, 2014, Butler and New South executed a "Confidentiality and Non-Solicitation Agreement." *Id.* ¶ 6; Confidentiality and Non-Solicitation Agreement [34-2] at 1, 2. This Agreement stated that New South "is in the business of selling and leasing equipment mats," Confidentiality and Non-Solicitation Agreement [34-2] at 1, and provided in relevant part as follows:

   1.    Agreement. Employee expressly agrees to the following:

      a.    Employee agrees that, during the term of his employment with the Company and for a period of twenty-four (24) months after the termination thereof, he will not directly or indirectly solicit or otherwise induce any employees of the Company to leave their employment with the

Company, nor will Employee directly or indirectly solicit or otherwise induce any of the Company's customers, accounts, suppliers or contacts to reduce or cease doing business with the Company.

      b.    Employee acknowledges and agrees that all accounts, suppliers or customers secured or serviced by Employee while employed by the Company, as well as the opportunity to solicit, secure or service same through Employee's efforts while employed by the Company, are the exclusive property of the Company. Employee recognizes that the Company necessarily will entrust him with confidential business information and trade secrets, including but not limited to the identity of accounts, suppliers, customers and others having business dealings with the Company, pricing information pertaining to the Company's business, and other information, which information is the exclusive property of the Company, and the entrusting of which necessitates absolute confidentiality. Employee agrees never to disclose any of this information except as authorized by the Company, agrees that he will never use any of the information in any manner which is adverse to the interests of the Company, and that he shall return any and all originals and copies (and any extracts, summaries or data pertaining thereto), in any format whatsoever, containing or pertaining to said information to the Company immediately upon the termination of his employment for any reason.

. . . .

2.    <u>Miscellaneous</u>. . . . (b) *Parties in Interest; Assignment*. This Agreement shall be binding upon and shall inure to the benefit of the parties, their respective heirs, representatives, successors and assigns. No party may assign its rights hereunder without the written consent of the other.

*Id.* at 1-2.

2.    <u>New South sells substantially all of its assets in an Asset Purchase Agreement with NSAES.</u>

On July 15, 2016, New South sold substantially all of its assets to New South

Access & Environmental Solutions, LLC ("NSAES"), through an Asset Purchase

Agreement. St. John Aff. [48-3] ¶ 4; Asset Purchase Agreement [48-2]. According to § 2.01 of the Asset Purchase Agreement, New South sold, except for certain specifically identified assets, all of its

> right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), [1] wherever located and whether now existing or hereafter acquired, which relate to, or are used or held for use in connection with, the Business . . . .

Asset Purchase Agreement [48-2] at 3.

The Asset Purchase Agreement defines "Business" as "laying and installing Mats and similar products, the sales and distribution of Mats, providing project management services and providing environmental solutions such as site evaluation, access planning, and other related site services." *Id.* at 2. "Mats" are defined in the Agreement as any and all types of mats, including rig mats. *Id.* at 61.

The assets sold included all of New South's "right, title and interest in and to (i) its customer accounts arising from or relating to the Business, . . and (ii) the outstanding contracts relating to such customer accounts." *Id.* at 2. New South also sold its real property, "[t]he value of the Business as a going concern," records of its customer lists and customer purchasing histories, and all intellectual property. *Id.* at 2-3.

Excluded from the sale were "Rig Mats" and "NSA Mats." *Id.* at 4. The

---

[1] Though the Agreement does not define goodwill, Black's Law Dictionary defines the term as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase; the ability to earn income in excess of the income that would be expected form the business viewed as a mere collection of assets." *Black's Law Dictionary* 715 (8th ed. 2004).

Agreement defines "Rig Mats" generally as all mats owned by New South encased in a steel frame. *Id.* at 63. The specific "Rig Mats" excluded from the asset sale were "[a]ll Rig Mats used in the Business located in North America." *Id.* at 79.

"NSA Mats" are defined as "the Mats owned by NSA on the Closing Date having a value approximately equal to the NSA Mat Value," which is $502,000.00. *Id.* at 62. "NSA" is New South America, a Colombian joint stock company. *Id.* at 4. Though the NSA Mats were excluded from the items sold, the Asset Purchase Agreement included a provision that contained certain requirements for the NSA Mats. *Id.* at 12. The Asset Purchase Agreement required New South, by December 31, 2016, to either: 1) pay NSAES the full "NSA Mat Value;" 2) sell all of the NSA Mats, and within ten days of New South's receipt of any proceeds from that sale, pay NSAES an amount equal to the sale proceeds; or 3) deliver the NSA Mats to NSAES. *Id.* at 12. In the event New South chose the second option (to sell the NSA Mats) and the sales price exceeded the NSA Mat Value, New South would be entitled to retain any excess proceeds from such sale after paying NSAES the NSA Mat Value. *Id.* The Agreement provided that if New South did not pay for, sell, or deliver the NSA Mats by December 31, 2016, then the next earn-out payment by NSAES to New South would be reduced by the NSA Mat Value. *Id.* at 13.

The Asset Purchase Agreement contained a non-competition covenant prohibiting New South from engaging in the "Covered Business," meaning the business of "Mats," within "the Territory" for five years. *Id.* at 32. "Territory" is

defined as "the area within the continents (sic) of North America." *Id.* at 64.

The Agreement also required New South to change its company name. *Id.* at 33. As part of the sale, NSAES agreed to pay New South earn-out payments based on NSAES's earnings. *Id.* at 8. Pursuant to the Asset Purchase Agreement, New South terminated all employees, including Butler, in July 2016. *Id.* at 35. Butler attests that he "was initially reassigned to" NSAES and then "reassigned to Jones Energy." Def. Aff. [34-1] ¶ 13-14.

3. <u>Butler joins a New South competitor and contacts his former customers.</u>

In July 2017, Butler left Jones and "joined Sterling Lumber, a company based in Phoenix, Illinois that [sells] access mats nationwide." *Id.* ¶ 20. Drew St. John, General Manager of New South, states that Sterling "is a business competitor of New South in the mat business." St. John Aff. [48-3] ¶ 18.

On July 28, 2017, Butler emailed Irby Construction, Butler Email to Irby [48-5], a company Butler was first introduced to while working for New South, St. John Aff. [48-3] ¶ 12. Butler informed Irby that he was now with Sterling, mentioned the comparative benefits of one of Sterling's products, and asked Irby to keep Butler in mind for any future matting projects. Butler Email to Irby [48-5]. St. John alleges that Butler also successfully solicited AEP Transmission, another company Butler was introduced to during his employment with New South, for a mat job. St. John Aff. [48-3] ¶ 12, 18. Because AEP Transmission accepted the sale from Butler, New South allegedly lost a large sum of money "in earn-out income from that lost mat project." *Id.* ¶ 18.

B.    Procedural History

1.    New South's Complaint and Amended Complaint

On October 3, 2017, New South filed a Complaint against Butler in the

Circuit Court of Madison County, Mississippi.    Compl. [1-1].    New South claimed

that Butler had violated the Confidentiality and Non-Solicitation Agreement by

contacting Irby Construction about doing business with Sterling within twenty-four

months after termination of his employment with New South.    *Id.* at 2.    The

Complaint sought injunctive relief enjoining Butler from disclosing New South's

confidential business information and soliciting New South's customers.    *Id.* at 2-5.

On October 4, 2017, Butler removed the case to this Court on grounds of diversity

jurisdiction.    Not. of Removal [1].

On October 6, 2017, New South filed a Motion [4] for Temporary Restraining

Order and/or Preliminary Injunction, incorporating by reference its Complaint.

Following a hearing, the Court denied New South's Motion, Hearing Tr. [34-6] at

60, on grounds that under Mississippi law, the termination of an employer's

business generally terminates the restrictive employment covenant, *id.* at 48 (citing

*Herring Gas Co. v. Pine Belt Gas, Inc.*, 2 So. 3d 636 (Miss. 2009)).    The Court found

that it was not clear to what extent New South's assets were sold and to what

extent New South retained an interest in any assets, as the parties had not

submitted the Asset Purchase Agreement to the Court.    *Id.* at 56-57.    Noting that

the Confidentiality and Non-Solicitation Agreement did not contain a geographic

limitation, *id.* at 52, the Court found that it was also not clear whether the lack of such a limit would be reasonable, given the nature of New South's business, *id.*

New South filed an Amended Complaint on December 20, 2017, adding the allegation that on August 23, 2017, Butler solicited monthly jobs from AEP Transmission and shared confidential information such as customer contacts with Sterling. Am. Compl. [30] at 2-3. The Amended Complaint alleges that Butler misappropriated confidential information provided to him by New South such as product specifications, customer contacts, pricing terms, and profit margins. *Id.* at 3. New South claims that Butler shared this information with Sterling Lumber. *Id.*

The Amended Complaint seeks an injunction enjoining Butler from disclosing or utilizing New South's confidential information or trade secrets, requiring Butler to return New South's property and files, and requiring Butler to account for New South's confidential information. *Id.* at 4. In Count II of the Amended Complaint, New South advances a claim for misappropriation of trade secrets, *id.* at 5, alleging that its trade secrets include the identity of its "accounts, suppliers, customers and others having dealings with" New South. *Id.* Count III asserts a claim for conversion, alleging that Butler removed and retained New South's confidential information and converted it to his personal economic advantage. *Id.* at 7. New South claims in Count IV that Butler breached the Confidentiality and Non-Solicitation Agreement by disclosing the identity of New South's customers, failing to return all confidential business information, and soliciting New South's

customers. *Id.* at 8-9. The Amended Complaint also brings a claim for unjust enrichment. *Id*. at 9-10.

2. <u>Butler's Motion for Summary Judgment</u>

On January 19, 2018, while discovery was ongoing, Butler filed a Motion [34] for Summary Judgment, arguing that "[t]here is simply no basis, either under the actual terms of the Non-Solicitation Agreement or Mississippi law, to find that New South can now enforce the agreement against Mr. Butler." Def.'s Mem. [36] at 11-12. According to Butler, New South sold virtually all of its assets to NSAES on July 25, 2016, *id*. at 4-5, and restrictive employment covenants are unenforceable if the former employer sells its assets and exits the business, *id*. at 9. Butler further contends that the "Agreement is unenforceable as ambiguous and unreasonable under Mississippi law." *Id*. at 12. With respect to New South's claims for misappropriation of trade secrets, unjust enrichment, and conversion, Butler takes the position that New South cannot show that it owned any trade secrets at the time of the alleged misappropriation. *Id*. at 16-19.

New South initially responded to Butler's Motion for Summary Judgment by filing a Motion [39] to Allow Time for Discovery under Rule 56(d). New South requested that Butler produce his non-competition agreement with Sterling, on the theory that comparing the two Non-Solicitation and Confidentiality Agreements would assist New South in defending against Butler's Summary Judgment Motion. Pl.'s Mem. [40] at 11. New South further sought discovery of Butler's employment negotiations and contracts with Sterling, what information Butler provided Sterling

that may have violated his Agreement with New South, what solicitations Butler may have made, and information on how Butler's alleged misuse of confidential information has damaged New South. *Id.* at 2, 13.

In an Order [47] entered on March 30, 2018, this Court denied New South's Motion to Allow Time for Discovery, finding that New South should already be in possession of any facts necessary to address whether New South retained any proprietary information or enforceable rights under the Non-Solicitation and Confidentiality Agreement. Order [47] at 5.

In light of the Court's Order Denying Motion to Allow Time for Discovery, New South filed its Response [48] to Butler's Motion for Summary Judgment on April 13, 2018. New South takes the position that it remains in business today because it files taxes, receives earn-out payments, recently incurred large shipping costs to retrieve mats from Colombia, and must manage and sell the Rig Mats and NSA Mats. Pl.'s Resp. [48] at 6-11. New South contends that the Confidentiality and Non-Solicitation Agreement is reasonable in scope because it is limited to New South's customers during the time of Butler's employment. *Id.* at 13. New South maintains that Butler misappropriated the identity of New South's customers, which was confidential, by divulging customer information to Sterling. *Id.* at 14.

Butler counters in his Reply that New South has not produced any evidence to show that it restricted the terms of the Asset Purchase Agreement such as would allow New South to reenter the equipment mat business. Reply [53] at 4.

## II. <u>DISCUSSION</u>

A.    <u>Summary judgment standard</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "[i]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, a court "view[s] the evidence and draw[s] reasonable inferences in the light most favorable to the nonmoving party." *Cox v. Wal–Mart Stores E., L.P.*, 755 F.3d 231, 233 (5th Cir. 2014). A court may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

Before it can determine that there is no genuine issue for trial, a court must be satisfied that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) (the nonmovant must set forth specific facts to contradict the specific facts set forth by the movant, general averments are not sufficient).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). An actual controversy exists "when both parties have submitted evidence of contradictory facts." *Salazar-Limon v. Houston*, 826 F.3d 272, 277 (5th Cir. 2016) (quotation omitted).

B.     Analysis

1.     Can New South enforce the Confidentiality and Non-Solicitation
       Agreement?

New South's Amended Complaint advances a claim for breach of contract on grounds that Butler breached the Confidentiality and Non-Solicitation Agreement. Am. Compl. [30] at 8. Butler seeks summary judgment on the breach of contract claim, contending that New South cannot enforce the Confidentiality and Non-Solicitation Agreement against him because New South has exited the equipment mat business and, alternatively, because the Agreement is ambiguous and unreasonable. Def.'s Mem. [36] at 11, 15.

Contracts which contain non-compete agreements are viewed by Mississippi courts "as contracts that restrict trade and individual freedom and are not favored by the law." *Redd Pest Control Co. v. Foster*, 761 So. 2d 967, 972 (Miss. Ct. App. 2000). Non-competition agreements "may be used to protect confidential

information, trade secrets," and "customer lists." *Bus. Commc'ns, Inc. v. Banks*, 91 So. 3d 1, 11 (Miss. Ct. App. 2011), *aff'd*, 90 So. 3d 1221 (Miss. 2012); *see also Donahoe v. Tatum*, 134 So. 2d 442, 443 (Miss. 1961) (upholding validity of restrictive employment covenant that prevented disclosure of confidential information). Mississippi courts have treated non-solicitation agreements as non-competition covenants. *Kennedy v. Metro Life Ins. Co.*, 759 So. 2d 362, 364-65 (Miss. 2000). Therefore, the Confidentiality and Non-Solicitation Agreement, which contains separate provisions restricting the solicitation of customers and the disclosure of confidential information, can be analyzed under Mississippi precedent addressing non-competition agreements.

The law in Mississippi is that "[g]enerally, the termination of an employer's business also terminates the restrictive employment covenant, because the abandonment or termination of the business extinguishes the covenant altogether." *Herring*, 2 So. 3d at 640. The determinative issue here, then, is whether a genuine dispute of material fact exists that New South terminated or abandoned its business in light of its Asset Purchase Agreement with NSAES.

In *Herring*, Jimmy Rutland signed a covenant not to compete when he began his employment with Broome Gas. *Id.* at 637. Broome Gas later sold its assets to Herring Gas through an asset-purchase agreement. *Id.* This asset-purchase agreement "included a non-compete clause which acknowledged that Broome Gas would not compete with Herring Gas in the propane gas business for a specified period of time and within a specified geographical area." *Id.* at 638. The asset-

purchase agreement also stated that Broome sold to Herring "all right, title and interest in" all of its propane assets which related in any way to the sale of propane gas, customers lists, and all accounts receivable. *Id.* at 639. On these facts, the Supreme Court of Mississippi upheld the chancellor's finding that the sale terminated Broome Gas' business and ended its right to enforce the non-competition covenant against Rutland. *Id.* at 640.

Like the parties in *Herring*, New South also entered into a non-competition covenant with NSAES, prohibiting New South from engaging "in the business of laying, installing, grading, culling, picking up, delivering, selling, leasing or otherwise distributing Mats," Asset Purchase Agreement [48-0] at 33, which "means any and all types of mats," *id.* at 61. The non-competition covenant further required that New South, for a period of five years following the closing date, shall not "recruit or solicit or attempt to recruit or solicit" any employee hired by NSAES, "solicit any customer, vendor or referral source" of New South for the purpose of distributing or selling products or services sold by New South, or "persuade or attempt to persuade any customer, vendor or referral source of [NSAES] to terminate or modify his, her or its relationship with" NSAES. *Id.* at 33-34.

To support its position that it has not left the business, New South relies heavily on the fact that it continues to earn income pursuant to the earn-out provision in the Asset Purchase Agreement. Pl.'s Resp. [48] at 5-8, 10-12. Though New South does not cite, nor has the Court discovered, any controlling authority for the proposition that an earn-out provision in an asset sale allows for the

enforceability of a non-compete covenant, courts in other jurisdictions have rejected such arguments. In *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 911 (N.D. Ill. 2014), Keywell, LLC, sold its assets to Keywell Metals, LLC, through an asset-purchase agreement. After two former employees of Keywell went to work for Cronimet Holdings, Keywell Metals sought to enforce the former employees' non-compete agreements that they had signed with Keywell. *Id.* at 912. Keywell Metals argued that Keywell continued to have a legitimate business interest in the non-compete agreements because the asset-purchase agreement provided that Keywell Metals would pay Keywell a percentage of the earnings from its business. *Id.* at 916. After discussing *Herring Gas*, the district court in *Cronimet* noted that "as part of the asset purchase agreement, Keywell agreed not to compete with Keywell Metals for a period of time, demonstrating that it had removed itself entirely from its previous line of business." *Id.* The district court thus found that "Keywell did not have a legitimate business interest in enforcing . . . the non-compete agreements once its assets were sold to Keywell Metals, like in *Herring Gas*." *Id.*

Similarly, in *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 923 (Pa. 2002), the Supreme Court of Pennsylvania found that the former employer's financial interest in receiving commissions earned on insurance accounts sold in an asset sale of the employer's insurance business was not a protectable business interest sufficient to allow the former employer to enforce a non-competition covenant. Rather, the court found that the former employer was no longer in the insurance business

following the asset sale.   *Id.*   While New South asserts that it is still operating in the mat business because it has filed tax returns and maintains bank accounts, it has not put forth any evidence that it receives income generated from its own mat business, as opposed to its income derived from earn-out payments from NSAES.

Unlike *Herring*, however, New South did not sell all of its assets.   Though it sold substantially all of its assets, including its real property and customer accounts, contracts, and lists, it did not sell its Rig Mats and NSA Mats. Nevertheless, New South has not shown that retention of these assets raises a genuine dispute that New South did not terminate its business.

St. John attests in his affidavit that he must manage and sell the Rig Mats and NSA Mats.   However, with regard to the Rig Mats, New South's non-competition covenant with NSAES prohibits New South from engaging in the mat business, specifically including Rig Mats.   New South has not pointed the Court to, nor has the Court discovered in its review of the Asset Purchase Agreement, a provision of the Asset Purchase Agreement that allows New South to sell the Rig Mats in a manner that would be inconsistent with its non-competition covenant with NSAES.   Therefore, St. John's vague assertion that New South must sell the Rig Mats does not create a genuine dispute of material fact that New South has terminated its business.

The Asset Purchase Agreement did allow New South to sell the NSA Mats, but if New South chose to sell these mats, the NSA Mat Value would have to be remitted to NSAES, although New South would be entitled to retain any profits in

excess of the NSA Mat Value. Viewing the evidence in the light most favorable to New South, and giving it every benefit of the doubt, a reasonable inference could be drawn that New South was still in the mat business until it sold the NSA Mats because New South could have potentially drawn a profit from such sale. But New South was required to do so by December 31, 2016. That day has come and gone, and there is no genuine dispute that Butler's alleged breaches of his non-competition agreement occurred after December 31, 2016. Butler attests in his affidavit that he remained employed with Jones Company until July 2017, at which time he joined Sterling Lumber, Def. Aff. [34-1] ¶ 20, and New South does not dispute this, Pl.'s Mem. [48] at 3. Thus, all of the breaches of Butler's Confidentiality and Non-Solicitation Agreement alleged by New South occurred after December 31, 2016, and during Butler's employment with Sterling Lumber. St. John Aff. [51-2] ¶¶ 18-19.

New South has not pointed to any evidence that prior to December 31, 2016, NSAES amended the Asset Purchase Agreement or otherwise further extended New South's opportunity to sell the NSA Mats and retain a profit. Nor has New South argued or demonstrated that the broad non-compete clause in the Asset Purchase Agreement, which prohibits New South from engaging in the mat business, allows New South to sell the NSA Mats after December 31, 2016. There is no genuine dispute in the present record, then, that after December 31, 2016, New South could not engage in the mat business. At that point, at the latest, New South's business was terminated, and with the termination of New South's business, the

Confidentiality and Non-Solicitation Agreement was extinguished. *See Herring*, 2 So. 3d at 640.

St. John's general assertions that he now will sell the NSA Mats are unavailing, and are not probative of whether New South's business terminated after it did not sell the NSA Mats on or before December 31, 2016. New South's vague allegation that it may potentially reenter the mat business is not sufficient "to breathe life into the dead contract." *Id.* New South cannot enforce the Confidentiality and Non-Solicitation Agreement, and the Court finds that summary judgment should be entered in favored of Butler on New South's breach of contract claim.

2. <u>Does New South still have trade secrets to protect?</u>

Count II of the Amended Complaint claims that Butler misappropriated New South's trade secrets. Am. Compl. [30] at 5-7. The Amended Complaint alleges that Butler misappropriated certain confidential information, including proprietary product specifications, customer contacts, pricing terms, and profit margins, *id.* at 3, and that New South's trade secrets include "the identity of New South's accounts, suppliers, customers, and others having dealings with New South," *id.* at 5. Butler moves for summary judgment on this claim, asserting that New South has not supplied any evidence to indicate that it owned any trade secrets at the time of the alleged misappropriation. Def.'s Mem. [36] at 16. Butler notes that New South sold its trade secrets and confidential business information as part of the Asset Purchase Agreement. *Id.* at 17.

Under the Mississippi Uniform Trade Secrets Act, "misappropriation" includes

> [d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Miss. Code Ann. § 75-26-3(b)(ii).

To establish a claim for misappropriation of trade secrets, a plaintiff must demonstrate: "1) that a trade secret existed; 2) that the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and 3) that the use of the trade secret was without the plaintiff's authorization." *Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 643 (N.D. Miss. 2000). The Mississippi Uniform Trade Secrets Act does not appear to require that a plaintiff hold ownership of the trade secret, as the statute speaks in terms of preventing the improper use "of a trade secret *of another*." Miss. Code Ann. § 75-26-3(b)(ii) (emphasis added). In analyzing similar statutory language in Wisconsin's trade secrets act, the district court in *Metso Minerals Industries v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 969, 972 (E.D. Wis. 2010), stated that "the phrase 'of another' on its face simply describes the relationship between the misappropriator and the trade secret – namely that the trade secret belongs to one other than the misappropriator. The phrase does not, implicitly or otherwise, limit protection only to the 'owner' of the trade secret."

Persuasive authority indicates that a plaintiff must generally prove that it

possessed a trade secret. *See, e.g., Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990). In this regard, courts have distinguished *possession* of a trade secret from its *ownership*. "Courts confronting the question of whether possession or ownership is required in a trade secrets misappropriation claim have rejected the argument that traditional ownership is required to prevail." *Fast Capital Mktg., LLC v. Fast Capital LLC*, No. CIV. A. H-08-2142, 2008 WL 5381309, at *12 (S.D. Tex. Dec. 24, 2008). Rather, courts "have generally come to the same conclusion: a party has standing to bring a trade secrets claim if it has possession of the trade secret." *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 527 (W.D. Tenn. 2015).

In interpreting the Maryland Trade Secrets Act, which contains language very similar to that in the Mississippi Uniform Trade Secrets Act, the United States Court of Appeals for the Fourth Circuit has concluded that "fee simple ownership" of a trade secret is not required, explaining that

> whether "fee simple ownership" is an element of a claim for misappropriation of a trade secret may not be particularly relevant in this context. While trade secrets are considered property for various analyses, the inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim. The conceptual difficulty arises from any assumption that knowledge can be owned as property. The "proprietary aspect" of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge. The Maryland Uniform Trade Secrets Act thus defines a trade secret as information that has value because it is not "generally known" nor "readily ascertainable." While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence, one "owns" a trade secret when one knows of it, as long as it remains a secret. Thus,

> one who possesses non-disclosed knowledge may demand remedies as provided by the Act against those who "misappropriate" the knowledge.

*DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (internal citations omitted).

Accordingly, in determining whether a party possesses a trade secret, courts focus on whether the party had knowledge of such secret. *Fast Capital*, 2008 WL 5381309, at *13; *DaimlerChrysler Servs. v. Summit Nat.*, No. 02-71871, 2006 WL 1420812, at *8 (E.D. Mich. May 22, 2006). In cases applying the decision in *DTM*, courts have allowed a possessor to pursue a misappropriation action, but in several of those cases, the plaintiff had explicitly retained a possessory interest. For example, in *Metso*, the plaintiff "sold all of the engineering, design information, and intellectual property rights" to Macon, but "Macon granted a non-exclusive, royalty-free right to continue to use the technology for service and warranty repair for the products sold by Metso." 733 F. Supp. 2d at 970-71. And in *Advanced Fluid Systems, Inc. v. Huber*, 28 F. Supp. 3d 306, 313 (M.D. Pa. 2014), though the plaintiff gave "legal ownership to all inventions or works" under a contract with another company, the plaintiff "remained in physical possession and control of the trade secrets and continued to us[e] them in a confidential manner to fulfill its obligations."

Here, however, New South sold all "right, title and interest in, to and under all of the assets, properties and rights of every kind and nature," and specifically sold records of its customer lists, customer purchasing histories, all intellectual property, and all "right, title and interest in and to" its customer accounts. For

that reason, this case seems more analogous to *BlueEarth Biofuels, LLC v. Hawaiian Electric Co.,* No. CIV. 09-00181 DAE, 2011 WL 2116989 (D. Haw. May 25, 2011), *aff'd*, 531 F. App'x 784 (9th Cir. 2013). There, the district court noted that "at the very least a plaintiff must be a lawful possessor of the trade secrets or confidential information." *Id.* at *21 (citing *DTM*, 245 F.3d at 331; *Metso*, 733 F. Supp. 2d at 970-71). The court found that "BlueEarth was no longer legally in possession of the trade secrets because it had transferred, without reservation, all of the relevant confidential information and trade secrets to BEMB." *Id.* The relevant agreement in that case provided that the plaintiff "assigns and transfers to BEMB all intellectual property and proprietary rights" and that BEMB is the "exclusive owner" of such property and rights. *Id.* Given such language, the district court found that "BlueEarth cannot now claim lawful possession of the trade secrets or confidential information at issue" and the plaintiff did not have standing to pursue a misappropriation claim. *Id.*

Butler contends that summary judgment should be entered on New South's claim for misappropriation of trade secrets because New South did not own any trade secrets or confidential business information at the time of the alleged misappropriation. Def.'s Mem. [36] at 16. And New South does not contend, in response to Butler's Motion, that it has retained some ownership of the trade secrets. *See* Pl.'s Resp. [48] at 14-15. Rather, New South merely asserts that it took steps to maintain the confidentiality of the information. *Id.* at 15. In light of the Asset Purchase Agreement, there is no genuine dispute that New South did not

own such information at the time of the alleged misappropriation. Nevertheless, the weight of authority indicates that the lack of ownership is not necessarily dispositive of a misappropriation claim. *DTM* contemplates that a plaintiff need merely have "knowledge" of the trade secret in order to bring a cause of action for misappropriation.

Attached as Exhibit C to St. John's Affidavit is a list of all customers Butler called on or serviced for New South over the course of his employment there. St. John Aff. Ex. C [48-3] at 19-20. Butler has not addressed the issues of possession or whether knowledge of a trade secret is sufficient under Mississippi law to establish a plaintiff's standing to assert a misappropriation claim. And though the facts of this case appear to closely resemble those in *BlueEarth*, Butler has not argued if, or why, Mississippi courts would reach the same result as in *BlueEarth* in light of New South's knowledge of the trade secrets. Because the parties have not briefed this issue, the Court will deny Butler's request for summary judgment on New South's claim for misappropriation of trade secrets at this time, without prejudice to his right to reurge the issue at a later date.

3. New South's unjust enrichment claim is subject to dismissal.

Butler raises a similar argument regarding New South's unjust enrichment claim, contending that New South must be able to show that Butler holds property that belongs to New South, but the Asset Purchase Agreement demonstrates that New South did not own any of the alleged trade secrets that it contends Butler appropriated. Def.'s Mem. [36] at 18.

Though New South cannot enforce the Confidentiality and Non-Solicitation Agreement, this is not necessarily dispositive of an unjust enrichment claim, because such a claim "applies in situations where no legal contract exists." *Willis v. Rehab Sols., PLLC*, 82 So. 3d 583, 588 (Miss. 2012). "The basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person *what in equity is his or hers*." *Beasley v. Sutton*, 192 So. 3d 325, 332 (Miss. Ct. App. 2015) (emphasis added) (citation and quotation marks omitted). Under the doctrine of unjust enrichment, courts require the defendant "to refund the money or the use value of the property *to the person to whom in good conscience it ought to belong*." *Hans v. Hans*, 482 So. 2d 1117, 1122 (Miss. 1986) (emphasis added) (citation omitted).

New South does not appear to dispute Butler's assertion that it does not own any of the alleged confidential information. The undisputed evidence before the Court shows that New South sold all right, title, and interest in its customer lists, customer accounts, intellectual property, and intangible property. New South has not created a genuine dispute that the alleged confidential information belongs to New South or is the property of New South, which under Mississippi law, is required for an unjust enrichment claim. *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 342 (Miss. 2004) (citing *Fordice Const. Co. v. Cent. States Dredging Co.*, 631 F. Supp. 1536, 1538-39 (S.D. Miss. 1986)). The Court finds that summary judgment should be entered in favored of Butler on New South's unjust enrichment claim.

4. <u>New South's claim for conversion cannot withstand summary judgment.</u>

Lastly, Butler argues that summary judge is warranted on New South's conversion claim because New South did not own any proprietary information capable of being converted. Def.'s Mem. [36] at 19. New South contends that Butler owes it a common law duty not to use its customer list. Pl.'s Resp. [48] at 17.

Unlike a claim for misappropriation of trade secrets, a conversion claim does require the plaintiff to prove ownership of the property. "Conversion requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987). "Ownership of the property is an essential element of a claim for conversion." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 68 (Miss. 2004). The Asset Purchase Agreement provides that New South sold all "right, title and interest in" such information to NSAES. New South has not put forth any evidence to demonstrate that it still owns, rather than possesses or knows of, any customer lists covered by the Asset Purchase Agreement. For this reason, the Court finds that Butler is entitled to summary judgment on New South's conversion claim.[2]

### III. <u>CONCLUSION</u>

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Defendant

---

[2] Even if New South could demonstrate ownership, the Court has doubts whether the conversion claim could proceed to trial, as a court in this district has concluded in a previous case brought by New South that the Mississippi Uniform Trade Secrets Act, Mississippi Code section 75-26-15(1), preempted its conversion claim because it was premised on the same facts as its misappropriation claim. *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 532-34 (S.D. Miss. 2013).

Stephen Butler's Motion [34] for Summary Judgment is **GRANTED IN PART** as to Plaintiff's claims for breach of contract, unjust enrichment, and conversion. These claims are **DISMISSED WITH PREJUDICE**.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that Defendant Stephen Butler's Motion [34] for Summary Judgment is **DENIED IN PART WITHOUT PREJUDICE** as to Plaintiff's claim for misappropriation of trade secrets. This claim will proceed.

**SO ORDERED AND ADJUDGED**, this the 15th day of August, 2018.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE